In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00017-CV
______________________________


 
 
IN THE INTEREST OF
TYLER BLAINE AUSTIN, A MINOR CHILD
 
 
 


                                              

On Appeal from the 308th Judicial District Court
Harris County, Texas
Trial Court No. 9515443


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Ross


MEMORANDUM OPINION

          This case appears to be an appeal from a judgment regarding child support, signed
by the trial court December 8, 2004. On December 10, 2004, Angela C. Austin filed a
notice of appeal pro se in this case.


 Austin did not file a motion for new trial, a motion to
modify the judgment, or a motion to reinstate the case. See Tex. R. App. P. 26.1. 
Accordingly, the record in this case was due to be filed with this Court no later than
February 7, 2005. See Tex. R. App. P. 35.1. 
          As of Wednesday, April 6, 2005, we had not yet received the record in this case. 
On that date, our clerk's office informed Austin in a written letter that the record in this case
was overdue. See Tex. R. App. P. 37.3(a)(1) (appellate clerk shall notify parties and trial
court of overdue record). Further, because no affidavit of indigency had been filed with the
trial court, we reminded Austin that she was obligated to pay for the record or make
suitable arrangements with the trial court clerk and the court reporter. See Tex. R. App. P.
35.3(a)(2) (appellant responsible for paying for preparation of clerk's record or making
satisfactory arrangements); Tex. R. App. P. 35.3(b)(3) (appellant responsible for paying for
preparation of reporter's record or making satisfactory arrangements). The clerk of this
Court further informed Austin that either the record or Austin's response was due no later
than Monday, April 18, 2005, or the appeal would be subject to dismissal for want of
prosecution.
          As of this date, we have neither a record nor a response from Austin. Accordingly,
on our own motion, we dismiss the appeal for want of prosecution. See Tex. R. App. P.
37.3(b) (no clerk's record filed due to appellant's fault; no showing appellant entitled to
proceed without payment of costs).
 
 
                                                                           Donald R. Ross
                                                                           Justice


Date Submitted:      April 28, 2005
Date Decided:         April 29, 2005



"6-04-126-cvmcfarlandv.mcfarlandfinal/footnoteicon.gif" alt="Footnote" width="16" height="14" border="0">

 now appeals the trial court's
judgment, contending the trial court erred (1) by awarding spousal maintenance to Susan, and (2)
by awarding Susan a disproportionate share of the marital estate. We affirm the judgment of the trial
court.
I. The Trial Court's Findings of Fact and Conclusions of Law
            Often, the parties to a divorce will submit the issue of how to divide the marital estate to the
trial court. When that occurs in lieu of a jury trial, and when the trial court issues written findings
of fact and conclusions of law, we accord such findings and conclusions the same dignity as should
be given a jury's verdict. See Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991). 
Such was the case here. Consequently, while we must review the sufficiency of the evidence using
the usual standard of review


 as a consequence of resolving Stephen's claims that the trial court
abused its discretion, see Pickens, 62 S.W.3d at 214, "we may not interfere with the fact finder's
resolution of conflicts in the evidence," see Sabine Towing & Transp. Co. v. Holliday Ins. Agency,
Inc., 54 S.W.3d 57, 59 (Tex. App.—Texarkana 2001, pet. denied). 
            A. Findings of Fact
            The trial court's findings of fact that are relevant to the issues presented on appeal are:
12.Susan McFarland had primarily worked in the home as a homemaker. 
She had no vocational training. She had not worked outside the home until February
of 2004 after the divorce was filed.
 
13.While the divorce was pending, Susan McFarland had worked making
$7.00 per hour cleaning a friend's office and answering the phone. She had also
worked at several temporary jobs making a maximum of $9.00 per hour.
 
14.Susan's estimated net monthly income from employment at the time
of the divorce was approximately $1200.00 per month; together with estimated child
support of $1400.00 from Steve McFarland, her total net monthly income was
$2600.00 per month. Her estimated monthly expenses for maintaining the residence,
daycare, food, transportation, and miscellaneous items exceeded $4300.00.
 
15.If Susan McFarland returned to school on a full-time basis, it would
be unlikely that she could continue working a full-time job given the young ages of
her three children.
 
16.Susan McFarland's earnings capacity and employment skills required
training or education in order for her to become self-supporting.
 
17.The marital residence . . . was recently appraised at $178,000.00 and
the mortgage payoff was approximately $143,000.00. The net equity in the residence
is approximately $35,000.00. In the event the house is sold, the closing costs and real
estate commissions would cost an additional 10% of the market value of the
residence and the net equity realized from the sale would be approximately
$17,200.00.
 
18.The parties agreed that Stephen McFarland's pension maintained by
Fidelity Investments was worth approximately $245,952.
 
. . . .
 
20.The Fort Worth Credit Union account in Stephen McFarland's name
had a balance of $2785.00 immediately prior to the divorce.
 
21.The Fort Worth Credit Union account in Susan McFarland's name had
a balance of $45.36 immediately prior to the divorce.

                        . . . . 
 
25.The net value of the community estate (total community property
assets - total community liabilities) at the time of the divorce, not including the sums
borrowed from family members[,] was $267,032.40. If the residence was
immediately sold, the net value of the community estate would be approximately
$17,800 less, approximately $249,232.40.
 
26.Stephen McFarland was awarded [among other things, his Fort Worth
Credit Union account and one-half of the Fidelity pension plan].
 
27.Stephen McFarland was awarded [the balance to Citibank AA, all
debts incurred in his name since January 1, 2004, including the debt for the vehicle
he was awarded, the balance of two loans borrowed by the community estate from
Stephen's family members, a loan for money from the Fort Worth Credit Union that
Stephen used to pay off his credit card debt, and $1,318.84 for various medical bills].
 
28.Susan McFarland was awarded [among other things, the marital
residence, her Fort Worth Credit Union account and one-half of the Fidelity pension
plan].
 
29.Susan McFarland was awarded [debts incurred in her name since
January 1, 2004, the debt for the marital residence, her credit card debts, the debt
owed to Blockbuster, the balance of a loan borrowed by the community estate from
Susan's family members, $512.00 payable to Stephen for one month's vehicle rental,
and $389.20 for various medical bills].
 
30.The total net value of community assets and community liabilities
awarded to Susan McFarland was $147,855.50, which was 55% of the net value of
the total estate. If she immediately sells the residence, the net value would be
approximately $17,800 less considering the 10% in commissions and closing costs
for the sale. Then the net value of the estate to Susan McFarland would be
approximately $130,055.50, which would be 52% of the net value of the total estate.
 
31.The total net value of community assets and community liabilities
awarded to Stephen McFarland was $119,177, which was 45% of the net value of the
total estate.

            The trial court's findings regarding Susan's earning capacity and her living expenses were
supported by her testimony. She testified that she had been a homemaker for most of the marriage,
had allowed her manicurist's license to expire several years ago, and had only recently been able to
find employment (from which she earned between $7.00 and $9.00 per hour because of her limited
education, training, experience, and lack of professional licensure). She also testified that her
expenses exceed her income by $1,700.00 each month. She testified Stephen had a pension plan
currently worth $245,000.00. Finally, Susan submitted evidence regarding the appraised value of
the marital residence, the amount of equity the couple had in the home, and the balance owed on the
mortgage. 
            The trial court's findings regarding Stephen's earning capacity were supported by Stephen's
own testimony that he earns a base salary of $77,000.00 per year as a pharmaceutical sales
representative and that he receives periodic bonuses (suggesting his projected income would be in
excess of $80,000.00). During cross-examination by both Susan's attorney and by the children's
attorney ad litem, Stephen was forced to admit he had earlier defied a court order prohibiting him
from enrolling the children in a private school without first seeking Susan's approval. 
            Based on the evidence before the trial court, we cannot say the evidence is legally insufficient
to support the trial court's findings of fact.
            B. Conclusions of Law
            For purposes of this appeal, the relevant conclusions of law entered by the trial court are:
8.Stephen McFarland was ordered to pay spousal maintenance to Susan
McFarland for a period of three years - $1,200.00 per month for the first two years
and then dropping to $800 per month in the third year. This spousal maintenance
award was based upon the following factors:
 
∙Susan McFarland had primarily been a homemaker during the parties'
17 year marriage.
 
∙Stephen McFarland had a much higher earnings capacity of $87,000
plus per year based upon his estimated salary and bonuses as a
pharmaceutical representative.
 
∙If Susan McFarland and the children moved to Arlington, Texas, with
the financial assistance and housing provided by family members, her
monthly living expenses would be considerably less and she would have the
ability to meet her family's monthly living expenses solely on the anticipated
child support from Stephen McFarland.
 
∙Although it was Susan McFarland's desire to relocate to Arlington,
Texas with the children, she and the children were geographically restricted
to Gregg County, Texas in order for Stephen McFarland to visit with the
children on a week-to-week rotational basis.
 
∙During the eight months that the divorce was pending, Susan had not
been able to support herself with her limited income and child support from
Stephen McFarland. Her extended family in Arlington, Texas had provided
extensive financial support to her during the pendency of the divorce in order
for her to meet her monthly financial obligations.
 
∙Susan McFarland had exercised due diligence in attempting during
the pendency of the divorce to obtain suitable employment.
 
∙Susan McFarland had a limited earnings capacity of only $7 to $9 per
hour.
 
∙The financial resources available to Susan McFarland at the time of
the divorce were not sufficiently liquid to enable her to meet her minimum
reasonable monthly needs.
 
∙Susan McFarland needs re-training or education in order to develop
the necessary skills to become self-supporting.
 
∙The property awarded to Susan McFarland was not immediately
liquid to assist with meeting her monthly financial expenses.
 
. . . .
 
13.The division of the assets and debts between the parties was fair, just,
and equitable having due regard for Susan McFarland, Stephen McFarland and their
three young sons, based upon the following factors:
 
∙The disparity of earnings power between Stephen McFarland's wages
as a pharmaceutical representative, and Susan McFarland's ability to earn
only $7.00 to $9.00 per hour;
 
∙The ability of Susan McFarland to support herself compared to
Stephen McFarland's ability to support himself;
 
∙The ages of the children and the need for the children to maintain a
continuity of lifestyles between each household; and
 
∙The education and work history of Susan McFarland compared to
Stephen McFarland's education and work history.
 
            We now turn to the issues presented while simultaneously considering whether the trial court
correctly drew these legal conclusions from the facts in evidence. See Pickens, 62 S.W.3d at 214.
II. The Award of Spousal Maintenance
            Stephen first contends the trial court erred by awarding spousal maintenance to Susan. The
final decree of divorce orders Stephen to pay spousal maintenance in the amount of $1,200.00 per
month for twenty-four months, followed by a one-year period in which he was required to pay
$800.00 each month. Stephen asserts the trial court erred in awarding spousal maintenance because
(A) the record does not show Susan requested spousal maintenance, and (B) the trial court failed to
recognize Susan received sufficient assets from the division of the marital estate, the sale of which
(Stephen contends) would suffice to provide for Susan's immediate financial needs. 
            A. Had Susan Requested Spousal Maintenance?
            In the amended petition for divorce, Susan asked the trial court "to order that Petitioner
[Susan] be paid postdivorce maintenance for a reasonable period in accordance with chapter 8 of the
Texas Family Code." Moreover, before receiving evidence and argument on the division of the
marital estate, the trial court questioned the parties about what issues remained to be resolved at the
bench trial. During that period, the following exchange occurred:
            THE COURT: I'm just trying to find out what is at issue.
 
[Stephen's counsel]: Sure.
 
THE COURT: They're still fighting over the Bank of America debt?
 
[Stephen's counsel]: Yes.
 
THE COURT: And unpaid medical bills?
 
[Stephen's counsel]: Yes.
 
THE COURT: And alimony for her?
 
[Stephen's counsel]: Right.
 
THE COURT: Okay. What else?
(Emphasis added.) 
            First, we assume the trial court was referring to spousal maintenance when the court referred
to an award of "alimony." "Spousal maintenance" awards are permitted. Tex. Fam. Code Ann.
§ 8.051 (Vernon Supp. 2004–2005). 
            Next, our review of the record makes it clear that Susan's pleadings requested an award of
"spousal maintenance" and that Stephen knew of this possibility before the hearing. Stephen's claim
to the contrary is not supported by the record. We now turn to the issue of whether the trial court
erred by awarding spousal maintenance given the facts of this case.
            B. Did the Trial Court Err By Awarding Spousal Maintenance?
            There is a general presumption that spousal maintenance is not warranted "unless the spouse
seeking maintenance has exercised diligence in: (1) seeking suitable employment; or (2) developing
the necessary skills to become self-supporting during a period of separation and during the time the
suit for dissolution of the marriage is pending." Tex. Fam. Code Ann. § 8.053 (Vernon Supp.
2004–2005). A trial court's award of spousal maintenance will not be reversed unless it is shown
that the trial court abused its discretion in making such an award. Pickens, 62 S.W.3d at 214; In re
Marriage of Hale, 975 S.W.2d 694, 697 (Tex. App.—Texarkana 1998, no pet.); DuBois v. DuBois,
956 S.W.2d 607, 612 (Tex. App.—Tyler 1997, no pet.). A trial court abuses its discretion when it
acts without reference to guiding principles or supporting evidence, or when its decision is arbitrary
or unreasonable. In re Marriage of Jeffries, 144 S.W.3d 636, 638 (Tex. App.—Texarkana 2004, no
pet.). "However, the trial court does not abuse its discretion if there is some evidence of a
substantive and probative character to support the decision or if reasonable minds could differ as to
the result." Smith v. Smith, 115 S.W.3d 303, 305 (Tex. App.—Corpus Christi 2003, no pet.). As
part of our inquiry into determining whether the trial court abused its discretion by awarding spousal
maintenance, we must necessarily consider whether the evidence supporting that decision by the trial
court is supported by factually and legally sufficient evidence. Hale, 975 S.W.2d at 697; see also
In re Marriage of Lindman, No. 06-05-00043-CV, 2005 Tex. App. LEXIS 6654, at *12 (Tex.
App.—Texarkana Aug. 18, 2005, no pet. h.).
            Article 8.051 of the Texas Family Code permits a trial court to award spousal maintenance
if:
(2) the duration of the marriage was 10 years or longer, the spouse seeking
maintenance lacks sufficient property, including property distributed to the spouse
under this code, to provide for the spouse's minimum reasonable needs, as limited by
Section 8.054, and the spouse seeking maintenance:
(A) is unable to support himself or herself through appropriate
employment because of an incapacitating physical or mental disability;
(B) is the custodian of a child who requires substantial care and
personal supervision because a physical or mental disability makes it
necessary, taking into consideration the needs of the child, that the spouse not
be employed outside the home; or
(C) clearly lacks earning ability in the labor market adequate to
provide support for the spouse's minimum reasonable needs, as limited by
Section 8.054.

Tex. Fam. Code Ann. § 8.051.



            In this case, both Susan and Stephen testified they had been married longer than ten years. 
The trial court received evidence, without objection from Stephen, that Susan's monthly income and
expenses were (without including her credit card bills and making an adjustment for the agreed level
of child support) as follows:
            INCOME
                        Wages                                                             $1,200.00
                        Child Support                                                 $1,566.54
                        Net Monthly Income:                                   $2,766.54
                        Total Expenses:                                            $4,298.20
                        Less Net Income                                  – $2,766.54
                        = Monthly Shortfall                             =$1,531.66
            During the marriage, Susan kept the couple's home and tended to their three children, ages
three, six, and nine at the time of the divorce. Susan testified that her manicurist's license had
expired several years ago, and the only jobs she was able to secure during the pendency of the
divorce paid between $7.00 and $9.00 an hour, each position being only temporary. As of the final
hearing on the divorce, Susan had not yet been able to secure permanent, higher-paying employment. 
Susan also lacked any post-secondary education or vocational training that would enable her to
secure better employment, but she did plan to pursue post-secondary education once the divorce
became final. Stephen, on the other hand, expected to earn over $80,000.00 from his job as a
pharmaceutical sales representative. 
            In the case now on appeal, the trial court awarded the marital residence to Susan. The couple
had approximately $35,000.00 in equity in the home; $143,000.00 was still owed on the
mortgage—a significant monthly expense. The remaining significant asset, a retirement fund,


 was
divided evenly. The approximate value of the fund at the time of the divorce was $245,000.00. 
While one-half of that fund would be a significant amount, the trial court could reasonably assume
Susan would not have access to the full $122,500.00, absent severe tax consequences, until she
reaches retirement. See 26 U.S.C.A. § 408(d)(6) (West Supp. 2005). This is because the federal
government will treat the $122,500.00 as being now a separate retirement account for Susan. See
id.
            If Susan withdrew any of those funds before retirement, she would owe a significant amount
in federal taxes. See 26 U.S.C.A. § 408(d)(1) (West Supp. 2005). It is likely Susan would be left
with less than $100,000.00 after taxes,


 from which she would have to pay the mortgage, buy a
vehicle,


 pay for her college tuition and expenses, and pay the remainder of her living expenses for
the period during which she was enrolled in college.
            The purpose of spousal maintenance is to provide temporary and rehabilitative support for
a spouse whose ability for self support has deteriorated over time while engaged in homemaking
activities and whose capital assets are insufficient to provide support. O'Carolan v. Hopper, 71
S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.) (citing Act of May 26, 1995, 74th Leg., R.S.,
ch. 655, § 10.01(a), 1995 Tex. Gen. Laws 3543, 3577). Other courts, in considering if a spouse is
eligible for spousal maintenance, have upheld the award in situations where the spouse receiving the
maintenance obtained substantial property in the divorce proceeding when those capital assets
provided insufficient support. 
            In Deltuva v. Deltuva, 113 S.W.3d 882, 888–89 (Tex. App.—Dallas 2003, no pet.), the Fifth
Court of Appeals reversed a trial court's award of spousal maintenance because the award's duration
was longer than three years, but otherwise approved the general decision to award spousal 
maintenance. The court noted the wife was awarded "the majority of the marital estate," id. at 888,
but found there was evidence in the record to support the conclusion that the recipient spouse's living
expenses would significantly exceed her income (even after exhaustion of her savings).
            In Lopez v. Lopez, 55 S.W.3d 194 (Tex. App.—Corpus Christi 2001, no pet.), the husband
contended the trial court erred by awarding spousal maintenance to the wife because the latter
received sufficient property from the division of the marital estate from which she could provide for
her reasonable minimum needs. Ms. Lopez received a home appraised at $59,262.00, a vehicle
valued at $7,014.00, the proceeds of the sale of a home in the amount of $33,678.00, and a one-half
interest in a Thrift Savings Plan worth $20,778.00. The Thirteenth Court held there was sufficient
evidence in the record about the wife's "de minimus" education, a physical disability that prevented
her from working full time, and her inability to use the property garnered through the divorce
settlement to provide for her minimum needs. Id. at 199.
            In Amos v. Amos, 79 S.W.3d 747 (Tex. App.—Corpus Christi 2002, no pet.), the trial court
had found that, because of the kind and character of the assets—and as a result of the tax-deferred
community property requiring the payment of heavy penalties, interest, and taxes associated with the
withdrawal and use of the funds—that the property awarded to the wife was not sufficient to allow
her to meet her reasonable needs. Id. at 748–50.
            In Trueheart v. Trueheart, No. 14-02-01256-CV, 2003 Tex. App. LEXIS 8154 (Tex.
App.—Houston [14th Dist.] Sept. 23, 2003, no pet.) (mem. op.) (not designated for publication),
$290,000.00 of community property was awarded to the wife. The court of appeals noted that almost
one-half of that consisted of life insurance policies, I.R.A. accounts, and other assets that could not
be easily liquidated without significant penalties. The court affirmed an award of spousal
maintenance. 
            In Alaghehband v. Abolbaghaei, No. 03-02-00445-CV, 2003 Tex. App. LEXIS 3701, at *7
(Tex. App.—Austin May 1, 2003, no pet.) (mem. op.) (not designated for publication), the wife was
awarded about $118,000.00 in community assets. The appellate court noted that several of the assets
were retirement accounts and that the tax consequences and long-term financial consequences of
early withdrawal would render the liquidity of the assets problematic. Id. at *13 n.1. The court then
stated the spouse would exhaust the liquid assets she was awarded (approximately $85,000.00)
within two years. Id. at *13.
            Our reading of the cases that have examined the issue of eligibility for spousal maintenance
leads us to conclude the trial court in the instant case did not abuse its discretion in awarding spousal
maintenance. The primary asset awarded to Susan is the retirement account, which is subject to
significant taxes for early withdrawal. Similar amounts of tax-deferred retirement funds have been
considered by several courts to lack liquidity due to the substantial monetary disincentives for
withdrawal. Here, the trial court found the property awarded to Susan was not sufficiently liquid to
enable her to meet her minimum needs. To generate any immediately accessible income from this
fund would impose the significant early withdrawal tax consequences discussed previously. While
retirement benefits must be considered in determining eligibility for spousal maintenance, we cannot
say, based on the facts of this case, that the trial court abused its discretion in finding the retirement
account involved did not bar Susan from maintenance since her available capital assets appear to be
insufficient to provide adequate support.


 Likewise, the home is not a readily liquid asset and is
incapable of producing current income. Susan meets all other statutory eligibility requirements for
spousal maintenance (more than a ten-year marriage, clearly lacks ability in the labor market to
provide for her minimum reasonable needs). Therefore, the trial court did not abuse its discretion
in granting spousal maintenance. 
III. Division of the Marital Estate
            In his second point of error, Stephen complains that the trial court's division of the marital
estate did not result in a "just and right" division of the couple's assets and liabilities. He first
complains that Susan should not have been awarded the entire value of the couple's home because
the parties had allegedly agreed before trial to sell the marital residence. The only significant
difference between Stephen's share of the estate and Susan's share was the award of the home to
Susan. Stephen does not specifically complain about the trial court's division of any of the couple's
remaining assets or debts. 
            In this case, a number of reasons support the trial court's division. First, if a trial court finds
that the terms of an agreement between the parties to a divorce is not "just and right," the trial court
is not bound to accept the parties' agreement. Tex. Fam. Code Ann. § 7.006 (Vernon 1998). Nor
is the trial court required to divide the marital estate into equal shares. Murff v. Murff, 615 S.W.2d
696, 698–99 (Tex. 1981); Tate v. Tate, 55 S.W.3d 1, 10 (Tex. App.—El Paso 2000, no pet.). A trial
court may consider a number of factors, including the disparity of income earning potential, in
dividing the marital estate. Murff, 615 S.W.2d at 698–99. Thus, contrary to Stephen's position on
appeal, the trial court was not required to order the house be sold and its proceeds divided among
the parties.
            Second, the record reflects that, while the parties had seemingly agreed to sell the residence,
they left to the trial court the decision of how to divide the proceeds from the sale of that house. In
this case, the trial court's decision effectively awarded the entire proceeds from any home sale to
Susan. The trial court wrote in its findings of fact that Susan's sale of the marital residence would
likely garner her about $17,000.00.


 Stephen has not challenged this finding on appeal, nor can we
conclude that such a finding is unsupported by the record. We will, therefore, defer to that finding
under the appropriate appellate standard. See Anderson, 806 S.W.2d at 794. Thus, the trial court's
decision to award the marital residence to Susan resulted in her receiving assets worth approximately
$17,000.00 more than Stephen received. The trial court's findings of fact and conclusions of law
noted that, if Susan immediately sold the house, her share of the marital estate would have been
approximately fifty-two percent, while Stephen would receive the remaining forty-eight percent. 
This very small difference of four percent is the result of awarding Susan only one more asset than
was given to Stephen (in an otherwise fifty-fifty split of the community property), and we also note
that this asset is saddled with a $143,000.00 mortgage.
            Third, the trial court appointed both parents as joint managing conservators of the children. 
Under the trial court's custody order, the couple's children will spend alternate one-week periods with
each parent throughout the year, excluding specific holidays. Susan had asked to be allowed to move
with the children to the Dallas area; Susan's plan was to enlist the aid of her relatives in caring for
the children while she furthered her education. Stephen, however, wanted Susan to be required to
remain with the children in Gregg County. The trial court ultimately sided with Stephen on this
issue, but the trial court could also have been acting within its discretion by deciding that the price
of granting Stephen's residency requirement request would be to award the entirety of the marital
residence to Susan.
            Fourth, Stephen had admitted violating an earlier order by the trial court that prohibited him
from enrolling the children in private school without Susan's agreement. If the trial court's decision
to not award the home (or a portion of its sale proceeds) to Stephen was influenced by Stephen's
admitted violation of that court's pretrial orders, we cannot say such a consideration was improper,
unreasonable, or manifestly unjust in light of the facts of this case.
            Given all these reasons, we cannot say the trial court abused its discretion.
IV. Conclusion
            For the reasons stated, we affirm the judgment of the trial court. 
 


                                                                        Jack Carter
                                                                        Justice

Date Submitted:          September 13, 2005
Date Decided:             October 25, 2005